IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DESHUAN WHITFIELD,<br><br>Defendant. | **8:22-CR-228**<br><br>**MEMORANDUM AND ORDER ON OBJECTIONS TO FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS** |

The Government has charged the Defendant, Deshaun Whitfield, with one count of knowingly and intentionally possessing with the intent to distribute a mixture or substance containing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Filing 11 at 1. This charge stems from Whitfield's encounter with law enforcement in Omaha, Nebraska, on September 23, 2022, during which time approximately 40,000 fentanyl pills were found in Whitfield's backpack. *See* Filing 55 at 71.

On November 16, 2022, Whitfield filed a "Motion to Suppress Statements and Evidence" pertaining to his interactions with law enforcement at a bus station in Omaha, Nebraska. Filing 23 at 1. After holding an evidentiary hearing on the Motion, United States Magistrate Judge Michael D. Nelson filed a Findings and Recommendation. Filing 56 at 1. Judge Nelson recommends that Whitfield's Motion to Suppress be denied. Filing 56 at 1. This matter is now before the Court on Whitefield's objections to Judge Nelson's Findings and Recommendation. Filing 60. After reviewing the matter *de novo*, the Court overrules Whitfield's objections, adopts Judge Nelson's Findings and Recommendation, and denies Whitfield's Motion to Suppress.

## I.     I. BACKGROUND

Judge Nelson's Findings and Recommendation discusses the facts pertinent to Whitfield's Motion in greater detail. *See generally* Filing 56 at 1–8. The following background information provides context for the Court's ruling on Whitfield's objections.

On September 23, 2022, law enforcement officers assigned to a Drug Enforcement Agency (DEA) Commercial Interdiction Unit task force were conducting interdiction at the Trailways Bus Station in Omaha, Nebraska. Filing 55 at 10, 16–17. These officers included Special Agent (SA) Brenna Dworek with the DEA, Task Force Officer (TFO) Nicholas Bonney, TFO Nicholas Jaworski and TFO Steven Peck with the Nebraska State Patrol. Filing 55 at 10–11, 26, 71. Each of these officers were dressed in plain clothes at the time. *See* Filing 51 (Government Exhibit 2; Government Exhibit 3; Government Exhibit 4; Government Exhibit 10; Government Exhibit 12). Whitfield was a passenger on a bus heading from Denver, Colorado, with a scheduled stop in Omaha, Nebraska. Filing 55 at 27. His ultimate destination was Minneapolis, Minnesota, which required him to transfer buses when he arrived in Omaha. *See* Filing 55 at 21–23, 27–28, 37-38.[1] For ease of reference the Court will refer to the bus that Whitfield arrived on as the "eastbound bus" and will refer to the bus that Whitfield was transferring to as the "northbound bus."

At approximately 5:50 a.m. that morning, after Whitfield's eastbound bus had arrived at the Omaha bus station, SA Dworek noticed "a small red suitcase" in the lower luggage compartment of the eastbound bus "that did not have identification on it." Filing 55 at 16, 24.[2] SA Dworek later explained during the suppression hearing that when a bus arrives at the Omaha bus

---

[1]SA Dworek testified that not every passenger on the bus coming from Denver would necessarily transfer to a new bus at the Omaha bus station because that bus continues on toward Chicago. Filing 55 at 29.

[2] TFO Peck testified that the bus Whitfield was on typically arrived at the Omaha bus station between 5:00 a.m. and 5:30 a.m. Filing 55 at 120. TFO Bonney testified that the bus, "if it arrives on time, arrives around 5:30 in the morning[.]" Filing 55 at 37.

station, the lower luggage compartment will open and "[a]nybody"—including other passengers—can "handle" and take luggage off the bus. Filing 55 at 12–15. SA Dworek "grabbed [the red suitcase] off of the bus and placed it near the front tire, next to the exit door of the [eastbound] bus" so that "somebody could claim the luggage and get an identification of the luggage." Filing 55 at 18. When Whitfield exited the eastbound bus, the suitcase was positioned near the bus's exit door, and he took possession of it. Filing 55 at 18. SA Dworek did not have possession of the suitcase after Whitfield exited the bus. Filing 55 at 16–19, 130–131; Filing 51 (Government Exhibit 2).[3]

After Whitfield took hold of the suitcase, SA Dworek approached him, identified herself as a law enforcement officer, and advised that he was neither in trouble nor under arrest. Filing 55 at 19. She asked Whitfield if the red suitcase was his and he said that it was. Filing 55 at 20. The two briefly discussed Whitfield's travel plans, and he told her that he was coming from Arizona and going to Minneapolis. Filing 55 at 19–21. SA Dworek also asked Whitfield if she could "see his ticket" and he provided it to her. Filing 55 at 21. After looking at the ticket, SA Dworek "asked [Whitfield] to obtain an identification tag for his luggage so that he wouldn't lose it in his route of travel." Filing 55 at 21. She also returned his bus ticket to him. See Filing 51 (Government Exhibit 2). At no point in their brief interaction did SA Dworek ever grab Whitfield, tell him he was not free to leave, point any firearms at him, block his path of travel, or delay him from getting on his next bus. Filing 55 at 22. During the suppression hearing, she testified that the tone of voice she used with him was "calm and respectful" and that Whitfield's tone with her was also "calm and

---

[3] Whitfield initially raised the issue of whether the officers "seized [his] suitcase from the luggage hold and meaningfully interfered with his possessory interests in it." Filing 24 at 4. However, he has not raised this issue in his Statement of Objections to the Findings and Recommendation. See generally Filing 60. He has therefore waived the matter. See Fed. R. Crim. P. 59(b)(2). In any event, Judge Nelson correctly concluded that "SA Dworek's very limited interreference with the suitcase" did not implicate the Fourth Amendment. See Filing 56 at 9. Although waived, the Court notes that upon de novo review it adopts Judge Nelson's Findings and Recommendation on the issue.

respectful[.]" Filing 55 at 22. Whitfield then walked away from SA Dworek, took his suitcase, and placed it in the lower luggage compartment of the northbound bus he was scheduled to board. Filing 55 at 12, 19–25, 45–47; Filing 51 (Government Exhibit 2; Government Exhibit 12).

TFO Bonney personally observed Whitfield place his red suitcase in the luggage compartment of the northbound bus. Filing 51 (Government Exhibit 3; Government Exhibit 12). TFO Bonney then approached Whitfield while he was standing outside of the bus station near the northbound bus. Filing 51 (Government Exhibit 3; Government Exhibit 12). Their interaction was recorded on TFO Bonney's body camera. Filing 51 (Government Exhibit 3). TFO Bonney identified himself to Whitfield and noted that he was with the Nebraska State Patrol. Filing 51 (Government Exhibit 3). After advising him that he was not in any trouble, he then proceeded to ask Whitfield about his background, travel plans, and itinerary. Filing 51 (Government Exhibit 3).

Approximately one minute and 15 seconds into their conversation, TFO Bonney asked Whitfield if he had any identification on him. Filing 51 (Government Exhibit 3). Whitfield indicated that he did and then handed his driver's license to TFO Bonney. Filing 51 (Government Exhibit 3). At that point, TFO Bonney held on to Whitfield's identification and continued his conversation with Whitfield for approximately 30 seconds. Filing 51 (Government Exhibit 3). TFO Bonney then began relaying the information from Whitfield's identification to dispatch over the radio while still standing next to Whitfield outside of the bus stop. Filing 51 (Government Exhibit 3). The body camera footage shows that TFO Bonney held Whitfield's identification for approximately one minute total. Filing 51 (Government Exhibit 3). TFO Bonney then returned the identification back to Whitfield, Whitfield placed it in his wallet, and the two continued their conversation. Filing 51 (Government Exhibit 3). During this interaction and while speaking with TFO Bonny, Whitfield used his vape pen. Filing 51 (Government Exhibit 3).

After asking Whitfield more specifics about his travel, TFO Bonney told Whitfield that he worked security at the bus stop "kind of like TSA" and wanted to make sure that Whitfield's bag belonged to him. Filing 51 (Government Exhibit 3). Following some back and forth between Whitfield and TFO Bonney about whether he needed to have a luggage tag, TFO Bonney asked Whitfield if there was THC in his vape pen. Filing 51 (Government Exhibit 3). Whitfield said there was not, and TFO Bonney followed up by asking Whitfield whether he had any "weed" on him. Filing 51 (Government Exhibit 3). Whitfield shook his head in a manner that suggested the answer was "no," waved his hand, and said "Denver." Filing 51 (Government Exhibit 3). As TFO Bonney would later testify, he understood Whitfield to be saying "no, that was back in Denver." Filing 55 at 54. TFO Bonney then asked Whitfield when the last time he had been in Denver was, and Whitfield began pulling out his bus tickets. Filing 55 at 54; Filing 51 (Government Exhibit 3).

After reviewing the tickets, Whitfield clarified that he had a layover in Denver and passed through there. Filing 51 (Government Exhibit 3). TFO Bonney asked Whitfield if he could see the bus tickets, and Whitfield provided them to him. Filing 51 (Government Exhibit 3). The two continued their conversation with TFO Bonney asking Whitfield about the cost of his bus tickets, who bought them, and why he chose to ride the bus rather than fly. Filing 51 (Government Exhibit 3). TFO Bonney then shifted the conversation and began asking Whitfield whether he had any illegal drugs on his person. Filing 51 (Government Exhibit 3). Whitfield denied having any such contraband. Filing 51 (Government Exhibit 3). TFO Bonney followed up by asking if it was "ok" to search Whitfield's bag. Filing 51 (Government Exhibit 3). Whitfield initially responded, "Huh?" Filing 51 (Government Exhibit 3). TFO Bonney repeated his request, and although Whitfield's exact response is difficult to decipher from the body camera footage, Whitfield appeared to ask TFO Bonney for clarification. *See* Filing 51 (Government Exhibit 3). TFO Bonney responded by

suggesting that the requested search would be "for anything illegal" and then asked Whitfield, "Do you have anything illegal?" Filing 51 (Government Exhibit 3). Although Whitfield denied having anything illegal, he also mentioned a dispensary bag. Filing 51 (Government Exhibit 3); *see also* Filing 55 at 54–55 (TFO Bonney testifying as to this portion of their conversation). TFO Bonney asked Whitfield where the dispensary bag was, but before Whitfield answered the bus driver approach him and requested that he present his ticket. Filing 51 (Government Exhibit 3). TFO Bonney did not interrupt or interfere with Whitfield as he spoke with the bus driver. Filing 51 (Government Exhibit 3).

When the bus driver walked away, TFO Bonney resumed his conversation with Whitfield and again asked where his dispensary bag was. Filing 51 (Government Exhibit 3). Whitfield said that his dispensary bag was not in his luggage; it was with his cousin in Arizona. Filing 51 (Government Exhibit 3); Filing 55 at 55.[4] TFO Bonney then asked Whitfield again whether there was anything illegal in his luggage. Filing 51 (Government Exhibit 3). Whitfield said there was nothing illegal in his bag, just his "personal stuff." Filing 51 (Government Exhibit 3). TFO Bonney then said, "if you want to, we can go in the back room[.]" Filing 51 (Government Exhibit 3). Whitfield initially responded by shaking his head no and appeared concerned that he might miss his bus. Filing 51 (Government Exhibit 3); Filing 55 at 55. TFO Bonney then told Whitfield that the bus driver was not going to leave him and Whitfield responded by shrugging, gesturing toward the northbound bus's luggage compartment, and walking toward it. Filing 51 (Government Exhibit 3).[5] After Whitfield did so, TFO Bonney grabbed the red suitcase from the northbound bus's lower

---

[4] TFO Bonney testified that this did not make sense to him "because [Whitfield] . . . told [him] that he was coming from Denver just now from his layover on the bus and his cousin is in Arizona, which that's where he started his trip on the way back." Filing 55 at 55.

[5] TFO Bonney later testified that Whitfield was not going to miss his bus for two reasons: "One, because the . . . bus driver already came up and collected his ticket, knowing that he's a passenger. And, two, it's approximately 6:04 a.m. That bus, if it leaves on time, will leave at 6:15." Filing 5 at 56.

luggage compartment, placed it next to Whitfield, and pushed it toward him. Filing 51 (Government Exhibit 3). Whitfield took possession of his red suitcase and proceeded to wheel it into the back room of the bus station without assistance from TFO Bonney. Filing 51 (Government Exhibit 3). TFO Bonney did not place his hands on or otherwise touch Whitfield as they walked into the bus station together. Filing 51 (Government Exhibit 3).

Almost immediately upon entering the back room of the bus station, and without any prompting, direction, or instruction from TFO Bonney, Whitfield bent down toward the ground and started unzipping his suitcase. Filing 51 (Government Exhibit 3). At that point, TFO Bonney told him, "Hold on, you're ok," but Whitfield continued unzipping his suitcase anyway. Filing 51 (Government Exhibit 3). TFO Bonney did not handle Whitfield's luggage at this time, assist Whitfield with opening it, or direct Whitfield to open it in any particular manner. Filing 51 (Government Exhibit). As soon as the suitcase was opened, a green draw string bag was instantly visible. Filing 51 (Government Exhibit 3). Whitfield grabbed the green bag along with some clothes items and began to stand up. Filing 51 (Government Exhibit 3). TFO Bonney extended his arm out toward Whitfield, and Whitfield handed the green bag and an article of black clothing to TFO Bonney. Filing 51 (Government Exhibit 3).

TFO Bonney asked Whitfield if this was "all he had" and Whitfield replied that he also had "carts," which TFO Bonney understood to be slang for vaping cartridges. Filing 51 (Government Exhibit 3); Filing 55 at 61–62. TFO Bonney specifically asked if Whitfield was referring to "THC carts" and Whitfield responded in the affirmative. Filing 51 (Government Exhibit 3). TFO Bonney asked where the carts were, and Whitfield pointed to the green bag and said "it's in there." Filing 51 (Government Exhibit 3); Filing 55 at 62. TFO Bonney later testified that at the time he grabbed the green dispensary bag he could "smell marijuana emitting from it." Filing 55 at 62. TFO Bonney

opened the green bag and noticed that it contained dispensary products. Filing 55 at 64. Specifically, the green bag contained a white bag with the label "SEED & STRAIN CANNABIS CO." Filing 51 (Government Exhibit 19). The white bag also had a THC warning note on it and said that it contained "Marijuana." Filing 51 (Government Exhibit 19). At no point did Whitfield ever protest TFO Bonney's search of the green bag or his luggage. Filing 51 (Government Exhibit 3); Filing 55 at 63.

After looking through the dispensary bag, TFO Bonney continued to search the red suitcase and asked Whitfield to clarify his travel itinerary. Filing 51 (Government Exhibit 3). By this point in time, TFO Jaworski and SA Dworek had entered the back room of the bus station. Filing 51 (Government Exhibit 4). TFO Jaworski asked TFO Bonney if there was "weed" in the bag, and TFO Bonney indicated there was. Filing 51 (Government Exhibit 4). Upon hearing this, TFO Bonney directed Whitfield to take his backpack off and placed his hands on Whitfield's backpack. Filing 51 (Government Exhibit 4). Whitfield asked, "for what?" and TFO Jaworski responded, "Because we're going to search it." Filing 51 (Government Exhibit 4). TFO Jaworski then explained that they were going to search it because Whitfield had "weed" on him. Filing 51 (Government Exhibit 4). Whitfield did not immediately comply with TFO Jaworski's instructions. Filing 51 (Government Exhibit 4). A struggle ensued, Whitfield was taken to the ground, and was then placed in handcuffs. Filing 51 (Government Exhibit 4).

Once Whitfield was restrained, TFO Jaworski informed Whitfield that he had marijuana on him, that marijuana was illegal in Nebraska, and that they were going to search all of his property. Filing 51 (Government Exhibit 4). While TFO Jaworksi attended to Whitfield, TFO Bonney began searching Whitfield's backpack and quickly noted the presence of a large number of pills. Filing 51 (Government Exhibit 3; Government Exhibit 4). The investigation would later

8

reveal that these pills contained fentanyl and totaled about 40,000 in number. *See* Filing 55 at 71; Filing 51 (Government Exhibit 1 at 1; Government Exhibit 7 at 1). Approximately one minute and ten seconds after TFO Bonney first said that he found pills in the backpack, Whitfield was advised that before he said anything else they were going to "*Mirandize*" him. Filing 51 (Government Exhibit 3). After being so advised, Whitfield "continued to talk and continued to answer questions." Filing 55 at 73; Filing 51 (Government Exhibit 3; Government Exhibit 4).

Whitfield initially (and repeatedly) denied knowing that he had 40,000 or so fentanyl pills in his backpack. *See* Filing 51 (Government Exhibit 3). After telling TFO Bonney and TFO Jaworski that this was his "first time seeing this" and denied knowing about them previously, TFO Jaworski asked Whitfield, "So you allowed [TFO Bonney] to search your red bag, correct? Is that right . . . you allowed Investigator Bonney to search that red suitcase?" Filing 51 (Government Exhibit 3). Whitfield immediately and unequivocally responded, "Yes." Filing 51 (Government Exhibit 3). Additional facts relevant to the Court's disposition of this matter are addressed below.[6]

## II.    ANALYSIS

### A.  Standard of Review

Under 28 U.S.C. § 636(b)(1), different standards of review apply when a party objects to a pretrial decision or a proposed findings of fact and recommendations by a magistrate judge. *See* 28 U.S.C. § 636(b)(1). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . . . to which objection is made." *Id.*; *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) (When a party timely objects to a magistrate judge's report and recommendation, the district

---

[6] As previously noted, Judge Nelson's Findings and Recommendation addresses additional facts relevant to this case in greater detail. While the Court adopts Judge Nelson's Findings and Recommendation, it has set forth the foregoing facts to provide context to the specific objections Whitfield now raises in his Statement of Objections. *See* Filing 60.

court is required to make a de novo review of the record related to the objections . . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally meaning 'as new.' Our review is independent and not premised on the district court's appropriate use of its discretion. We are concerned only with the proper application of the law . . . ."). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court has read the transcript of the suppression hearing and has reviewed the exhibits admitted at the hearing.

### B. Whitfield's Objections

As previously noted, Whitfield filed a "Statement of Objections" to Judge Nelson's Findings and Recommendation. *See generally* Filing 60. The issues Whitfield raises in his

Statement of Objections are narrower than the issues he raised before Judge Nelson in his written submissions and at the suppression hearing. *See generally* Filing 23; Filing 24; Filing 55. Under the Federal Rules of Criminal Procedure, this Court "must consider de novo any objections to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). However, a party's failure to object in accordance with Rule 59 "waives a party's right to review." Fed. R. Crim. P. 59(b)(2); *United States v. Merrett*, 9 F.4th 713, 716 (8th Cir. 2021) (noting that the defendant "did not object to the magistrate judge's order denying his motion, and his failure to object waives his right to review under Federal Rule of Criminal Procedure 59(a)"), *cert. denied*, 142 S. Ct. 815 (2022); *see also United States v. Chen*, No. CR 21-250 (JRT/TNL), 2023 WL 1466503, at *3 (D. Minn. Feb. 2, 2023) (quoting *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015)). Whitfield divides his "Statement of Objections," into seven specific categories of objections. In each of these categories, Whitfield argues why he believes the Magistrate Judge should have recommended that his Motion to Suppress be granted. The Court will now address each of these objections in turn.

### 1. Objection 1: "Overview"

Whitfield's first objection is captioned "Overview." Filing 60 at 1. He explains that this objection is not a general and conclusory objection, but rather "is best described as a topic sentence, a statement of what follows below." Filing 60 at 2. As he puts it, "[t]he magistrate judge should have recommended that [his Motion to Suppress] be granted" and "Objections #2 through #7 explain, with specificity, why." Filing 60 at 2. The Court understands and acknowledges the purpose and scope of this objection. However, for the reasons explained in this Order, the Court has concluded on *de novo* review that Judge Nelson was correct to recommend denial of

Whitfield's Motion to Suppress. The following analysis of "Objections #2 through #7 explain, with specificity, why." Filing 60 at 2. Accordingly, Whitfield's first objection is overruled.

2. *Objection 2: "Detention"*

Whitfield's second objection is captioned, "Detention." Filing 60 at 2. He objects to Judge Nelson's conclusion that TFO Bonney's contact with him began as a consensual encounter. Filing 60 at 2 (citing Filing 56 at 11).[7] Whitfield insists that TFO Bonney detained him instead. Filing 60 at 2. In support of this position, Whitfield takes issue with two specific findings Judge Nelson made. Filing 60 at 2–3. He first takes issue with "the finding that 'TFO Bonney identified himself as an investigator with the Nebraska State Patrol, told [Whitfield] he was not in trouble, and began asking [Whitfield] about his travel plans.'" Filing 60 at 2 (citing Filing 56 at 3, 11). He argues that these comments "were mumbled and, given the surrounding noise, largely inaudible." Whitfield also takes issue with Judge Nelson's "finding that 'a reasonable person in [Whitfield's] position would have felt free to leave.'" Filing 60 at 2.

a. Whitfield's Factual Attack on the Evidence is Without Merit

The first issue Whitfield raises, *i.e.,* whether TFO Bonney's statements were sufficiently audible, is factual in nature. The Court has independently reviewed the evidence that Whitfield contests and finds that TFO Bonney's statements are sufficiently audible and comprehensible despite the background noise captured on the recording. *See* Filing 51 (Government Exhibit 3). Moreover, Whitfield does not point to any evidence suggesting that he did not hear or understand

---

[7] Whitfield does not object to Judge Nelson's conclusion that SA Dworek's initial contact with Whitfield was also a consensual encounter. *See* Filing 56 at 10. Any argument that SA Dworek's initial contact with Whitfield was not a consensual encounter is, therefore, waived. *See* Fed. R. Crim. P. 59(b)(2). Although Whitfield references SA Dworek in this objection, his argument centers on the fact that he was approached by "two law-enforcement officers within a matter of minutes." Filing 60 at 2. Thus, Whitfield has waived any argument that SA Dworek's initial encounter with him—which occurred before his encounter with TFO Bonney—was itself a detention. Even if he had not waived this argument, the Court agrees on *de novo* review that Judge Nelson was correct in finding that "Defendant's initial encounter with SA Dworek was clearly consensual and not a seizure." Filing 56 at 10.

TFO Bonney when he identified himself as a member of the Nebraska State Patrol and told Whitfield that he was not in trouble. This fact-based objection lacks merit and is overruled.

      b.   Whitfield's Legal Objection is Meritless as Well

The second issue Whitfield raises, *i.e.,* whether a reasonable person in Whitfield's position would have felt free to leave, requires legal analysis. "A 'consensual' encounter between law enforcement and a citizen triggers no Fourth Amendment scrutiny." *United States v. Grant*, 696 F.3d 780, 784 (8th Cir. 2012). In fact, the Supreme Court has specifically recognized that, "[t]he Fourth Amendment permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse." *United States v. Drayton*, 536 U.S. 194, 197 (2002); *see also United States v. Richards*, 611 F.3d 966, 969 (8th Cir. 2010). Upon the *de novo* review of the record and considering the totality of the circumstances as well as the particular factors relevant to this analysis, the Court agrees with Judge Nelson's conclusion that Whitfield's initial interactions with law enforcement were consensual encounters and he was not detained at that time.

      i.     Applicable Standards

"Whether an encounter is 'consensual' is simply the inverse of the objective standard for existence of a seizure: 'So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.'" *Grant*, 696 F.3d at 784 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). In determining whether an encounter was consensual, the Eighth Circuit has explained that courts should consider the totality of the circumstances and has specifically identified "seven non-exclusive factors" that are relevant to this analysis. *See United States v. Lozano*, 916 F.3d 726, 729 (8th Cir. 2019). They are: (1) whether officers positioned themselves in a way to limit the person's freedom of

13

movement, (2) the number of officers present, (3) whether officers displayed weapons, (4) whether physical touching occurred, (5) whether officers used language or intonation indicating compliance is necessary, (6) whether officers retained the person's property, and (7) whether officers indicated the person is a focus of a particular investigation. *See id.* Ultimately, "[t]he burden of proving that an encounter was consensual rests with the government." *Id.*

ii.     Discussion

On balance and when giving due consideration to the totality of the circumstances, the seven non-exhaustive factors identified by the Eighth Circuit clearly weigh in favor of finding a consensual encounter. *See Lozano*, 916 F.3d at 729. TFO Bonney (as well as SA Dworek before him) told Defendant he was not in any trouble; therefore, the officers never indicated to Whitfield that he was the focus of a particular investigation. *Id.* The officers also never displayed weapons while speaking with Whitfield outside the bus station. *Id.* The body camera footage further shows that the officers did not position themselves in such a way as to limit Whitfield's freedom of movement. *See* Filing 51 (Government Exhibit 2; Government Exhibit 3).[8]

Moreover, Whitfield does not object to or otherwise contest Judge Nelson's finding that TFO Bonney "used a conversational and non-threatening tone" when speaking to him outside the bus stop. Filing 56 at 11.[9] While Whitfield claims that TFO Bonney spoke "with an air of authority," the evidence before the Court plainly shows that the officers did not use "language or intonation indicating compliance [was] necessary" outside of the bus station. *Lozano*, 916 F.3d at

---

[8] In fact, Whitfield continued to vape throughout his conversation with TFO Bonney, further indicating that he did not feel constrained in his actions at the time. *Cf. United States v. Lillich*, 6 F.4th 869, 877 (8th Cir. 2021) (noting that the defendant "continued to dry off the car while the officers retained his identification, suggesting that the retention of his identification did not interfere with his activities or meaningfully prevent him from terminating the encounter or leaving" and further concluding that under the totality of the circumstances the officer's retention of the identification card "did not restrain his liberty"), *cert. denied*, 142 S. Ct. 1220 (2022).

[9] Having independently reviewed, the body camera footage, the Court agrees that TFO Bonney used a conversational and non-threatening tone when speaking to Whitfield. *See* Filing 51 (Government Exhibit 3).

729. As for the number of officers present, Whitfield correctly notes that he was "approached by two-different law enforcement officers within a matter of minutes." Filing 60 at 2. However, this did not transform the situation into a seizure. *See United States v. Richards*, 611 F.3d 966, 969 (8th Cir. 2010) (noting that although a second officer's questioning of the suspect "followed soon after" the first officer's questioning, this "did not constitute a seizure" of the suspect). The body-camera footage shows that TFO Bonney and SA Dworek spoke with Whitfield separately; they did not surround him outside of the bus stop. *See* Filing 51 (Government Exhibit 2; Government Exhibit 3). Thus, "[t]his was not a case of multiple officers coercing a bus passenger into submission by assailing him with multiple requests for the same thing until he complied." *Richards*, 611 F.3d at 969. Indeed, SA Dworek's initial interaction with Whitfield was quite brief. *See* Filing 51 (Government Exhibit 2); *see also* Filing 56 at 2 (Judge Nelson noting that "After . . . [Whitfield's] less-than-one-minute interaction [with SA Dworek], [Whitfield] took his suitcase and walked away from SA Dworek") (footnote citation omitted). Given these circumstances, the Court finds that the number of officers present and involved in the situation is a factor weighing in favor of finding a consensual encounter.

The foregoing demonstrates that five of the seven non-exhaustive factors clearly weigh in favor of concluding that the government met its burden of proving Whitfield's initial encounter with law enforcement was consensual. *See Lozano*, 916 F.3d at 729. The Court will now explain why the final two factors—whether physical touching occurred and whether officers retained the individual's property—also point to this conclusion. First, the body-camera footage does not show any instance where either SA Dworek or TFO Bonney touched Whitfield outside of the bus stop. *See* Filing 51 (Government Exhibit 2; Government Exhibit 3). While Whitfield cites a number of actions that TFO Bonney took in support of his argument that no reasonable individual in his

15

situation would have felt free to leave (*e.g.*, checking his identification, asking him about his luggage, etc.), at no point does Whitfield claim that TFO Bonney—or any other officer—laid a hand on him at this point in time. *See* Filing 60 at 2-3.[10] Whitfield was not touched in a way indicative of a seizure until TFO Jaworski grabbed his backpack after the officers saw evidence suggesting that Whitfield possessed marijuana. *See* Filing 51 (Government Exhibit 3; Government Exhibit 4). As such the lack of physical touching is a factor weighing in favor of finding a consensual encounter.

The Court is aware that in a very recent case involving the same Omaha bus stop and some of the same task force officers at issue here, the Eighth Circuit noted, "[t]here is no dispute that the [task force officers] conducted a *Terry* stop when [one of the officers] placed his hand on [the defendant's] shoulder and instructed him to go with them to a private space in the back of the bus station." *United States v. Jimenez*, 75 F.4th 848, 853 (8th Cir. 2023). The present case is different. Again, the body camera footage does not show TFO Bonney—or any other law enforcement officer—touching Whitfield at this point in time. Second, and as Judge Nelson correctly noted, TFO Bonney told Whitfield, "if you *want to*, we can go in the back room[.]" Filing 56 at 3 (emphasis added); *see also* Filing 51 (Government Exhibit 3). In *Jimenez*, the officer (who also happened to be TFO Bonney) not only placed a hand on the defendant but also "*instructed* [him] to go with the investigators to a more private space in the back of the bus station." *Jimenez*, 75

---

[10] TFO Bonney's body camera shows that after Whitfield went inside of the bus stop, bent down to the ground next to TFO Bonney, and began opening up his suitcase, TFO Bonney touched Whitfield's backpack with his open hand very briefly as he told him, "Hold on, you're ok." Filing 51 (Government Exhibit 3). The nature of this one-second touch of Whitfield's backpack is not the type of physical contact indicative of a seizure and Whitfield has not argued that it amounted to one either. *See I.N.S. v. Delgado*, 466 U.S. 210, 215 ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred").

16

F.4th at 851 (emphasis added).[11] TFO Bonney's prefatory phrase, "if you want to" clearly conveyed that Whitfield was under no obligation to go to the back room and that the decision was his to make. This was neither an instruction nor an ultimatum; it was an option extended to Whitfield that he was free to decline. A reasonable person in his position would have understood it as such.

That brings the Court to the last of the seven non-exhaustive factors: whether officers retained Whitfield's property. *Lozano*, 916 F.3d at 729. Whitfield notes that TFO Bonney "secured Whitfield's ID and ticket" and "ran his name through dispatch[.]" Filing 60 at 3. However, "[a] request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request[ ] is required.'" *United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006) (alteration in original) (quoting *Bostick*, 501 U.S. at 435). TFO Bonney's body camera footage shows that he did not convey a message that compliance with his request for identification was required. Filing 51 (Government Exhibit 3). Nor did he convey any such message when he asked to see the bus passes that Whitfield pulled from his pocket on his own initiative during their conversation. Filing 51 (Government Exhibit 3). In both instances, TFO Bonney requested permission to see these materials, and Whitfield agreed to do so. *Cf. United States v. Drayton*, 536 U.S. 194, 205 (2002) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response") (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984)).

The fact that TFO Bonney briefly held onto Whitfield's identification for approximately one minute before returning it back to him does not transform the consensual nature of the

---

[11] *Jimenez* is further distinguishable in that the officers there prevented the defendant from carrying his own bag to the back of the bus station, pulled the suspect's blanket off of him without permission, brushed the suspect's waistline with the back of one of their hands, and then "shuffled" the suspect into the back room of the bus stop and handcuffed him. *Id.*

encounter. This brief retention period is far shorter than "the officer's seven-minute retention" of the defendant's identification card that took place in another recent case before the Eighth Circuit. *See Lillich*, 6 F.4th at 876. In that case, the Eighth Circuit concluded that such a retention period "was not inconsistent with the type of brief examination [the defendant] consented to by voluntarily turning over his identification card." *Id.* Furthermore, like the defendant in *Lillich*, Whitfield "never requested that [TFO Bonney] return his identification." Particularly given that TFO Bonney only held onto Whitfield's identification for about a minute and then returned it to him, the Court does not find that this factor weighs against finding a consensual encounter. But even if it did, the Court would "assign the 'retention of property' factor little weight"—just as the Eighth Circuit did in *Lillich*. *See id.* at 877.[12]

Upon *de novo* review and considering the totality of the circumstances, including the seven non-exhaustive factors the Eighth Circuit has specifically noted to be relevant to this analysis, the Court agrees with Judge Nelson's conclusion that Whitfield's initial encounter with law enforcement was consensual in nature and not a seizure under the Fourth Amendment. Accordingly, Whitfield's second objection outlined in his Statement of Objections, Filing 60 at 2–3, is overruled.

3. *Objection 3: "Consent"*

Whitfield's third objection is captioned, "Consent." Filing 60 at 3. He contends that Judge Nelson erred in concluding he "provided valid consent to search his suitcase." Filing 60 at 3 (citing Filing 56 at 12–15). He breaks this objection down further and addresses it under four separate

---

[12] This same analysis applies with respect to TFO Bonney's handling of Whitfield's bus passes. TFO Bonney asked permission to look at the bus passes, and Whitfield handed them over without any objection or concern and never requested them back. *See* Filing 51 (Government Exhibit 3). A review of TFO Bonney's body camera footage shows that when the bus driver arrived to collect Whitfield's ticket, he provided it to her without any interference from TFO Bonney. *See* Filing 51 (Government Exhibit 3); Filing 55 at 56 (TFO Bonney testifying at the suppression hearing that Whitfield was not "going to miss his bus" because "the bus driver already came up and collected his ticket").

headings that he captions as follows: (1) "The TSA Misrepresentation," (2) "Things Left Unsaid," (3) "The Impact of Detention," and (4) "Denial Followed by Acquiescence is Insufficient." Filing 60 at 3–6. Before addressing each of these arguments, however, the Court finds it appropriate to highlight evidence in the record that counsels quite heavily in favor of finding that this was a consensual search. First, TFO Bonney's body camera footage shows that when Whitfield walked into the bus station he immediately began opening up his luggage and, even though TFO Bonney told him, "Hold on, you're ok," Whitfield continued opening up his suitcase anyway. Filing 51 (Government Exhibit 3). Second, when Whitfield was later asked whether he consented to a search of his luggage, he admitted that he did. His admission is captured on body camera footage. *See* Filing 51 (Government Exhibit 3). TFO Jaworski asked Whitfield in no uncertain terms whether he "allowed [TFO] Bonney to search that red suitcase" and Whitfield responded, "Yes." Filing 51 (Government Exhibit 3). This admission significantly undermines the arguments Whitfield raises now. Nevertheless, the Court will explain why, irrespective of Whitfield's admission, that Whitfield consented to the search, and why each of his four sub-arguments lack merit.

      a.   Applicable Standards

"A consensual search is consistent with the Fourth Amendment because it is 'reasonable for the police to conduct a search once they have been permitted to do so.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 891–92 (8th Cir. 2020) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "'The issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented.'" *Garcia-Garcia*, 957 F.3d at 892 (quoting *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018)). "To show that a person consented to a search, the Government must demonstrate that consent was the product of an essentially free and unconstrained choice." *Garcia-Garcia*, 957 F.3d at 895 (internal quotations and citation

omitted). However, the Government is "'not required to demonstrate that [an individual knows] of his right to refuse the request to search as a prerequisite to establishing . . . voluntary consent.'" *Id.* at 897 (ellipses in original) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 687–88 (8th Cir. 2004). Instead, it need only prove "that a reasonable officer would believe that the consent was not the result of 'duress or coercion, express or implied.'" *Garcia-Garcia*, 957 F.3d at 897 (quoting *Cedano-Medina*, 366 F.3d at 688). As such, consent "may be inferred from the subject's 'words, gestures, and other conduct.'" *Garcia-Garcia*, 957 F.3d at 895 (quoting *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2010)).

In determining whether consent is given voluntarily, the Eighth Circuit has instructed that the totality of the circumstances are to be considered and has identified several factors that are relevant to this analysis. *See Garcia-Garcia*. 957 F.3d at 896.

> Those factors include the defendant's age, education, intelligence, sobriety, and experience with the law; and . . . context . . ., such as the length of . . . questioning, the substance of any discussion ... preceding the consent, whether the defendant was free to leave . . ., and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Garcia-Garcia*, 957 F.3d at 896-97 (ellipses in original) (citation omitted).[13]

      b.  Discussion of Whitfield's Four Sub-Arguments

          i.    "The TSA Misrepresentation"

The first sub-argument Whitfield makes with respect to whether he provided valid consent to search relates to whether TFO Bonney made a misrepresentation in telling him that "he and the other officers were 'kind of like TSA.'" Filing 60 at 3 (citing Filing 56 at 14). Whitfield claims that "[b]y implying that the task force performed the same functions as, and possessed the same

---

[13] The Eighth Circuit has noted that it has "grouped these factors into three categories: (1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time he gave his consent." *Garcia-Garcia*, 957 F.3d at 897.

absolute search authority as, the airport-omnipotent Transportation Security Administration, TFO Bonney insinuated that consent was a mere formality" and this "misrepresentation affected the 'substance of any discussion . . . preceding he consent[.]'" Filing 60 at 3–4. Whitfield also objects to Judge Nelson's "conclusion that [Whitfield] did not rely upon this misrepresentation[,]" citing the temporal proximity between when TFO Bonney made this statement and when the search of the luggage occurred. *See* Filing 60 at 4.

As an initial matter, the Court notes that Whitfield's Statement of Objections does not quote TFO Bonney's TSA reference in its entirety. *Compare* Filing 60 at 3 *with* Filing 51 (Government Exhibit 3). As Judge Nelson correctly noted in his Findings and Recommendation, TFO Bonney did not simply tell Whitfield that he and his fellow officers were "kind of like TSA," but rather that told they come down to the bus stop and "*work security* kind of like TSA." Filing 51 (Government Exhibit 3); Filing 56 at 3 (emphasis added). In likening his work to that performed by TSA, TFO Bonney neither suggested nor implied that he possessed "omnipotent" authority as Whitfield argues. *See* Filing 60 at 3. Indeed, the Court agrees with Judge Nelson's determination that this was neither a threat nor "necessarily a misrepresentation." Filing 56 at 14. The reason this is not a misrepresentation is because TSA agents provide security at airports and these law enforcement agents likewise provided a form of security at the bus station. *See* Filing 55 at 10 (SA Dworek testifying that the commercial interdiction unit generally "work[s] at sort facilities and mass transportation facilities"); Filing 55 at 168 (SA Iten testifying that "the commercial interdiction unit frequently goes to the Omaha bus station to investigate possible drug activity"). For that matter, TFO Bonney never said that he and his fellow agents performed the same exact functions as TSA agents, he caveated this statement by expressly stating they work security "*kind of* like" them. Filing 51 (Government Exhibit 3) (emphasis added). Even if one were to construe

this as a misrepresentation, it was a minor one at most and—in any event—"there is no evidence that [Whitfield] actually relied upon this representation when providing consent to search." *See* Filing 56 at 14; *United States v. Urbina*, 431 F.3d 305, 309 (8th Cir. 2005) (outlining that whether the defendant "*relied* upon promises or misrepresentations made by the police" is a factor used to "examin[e] the environment in which consent was given") (emphasis added). Accordingly, the Court is not persuaded that TFO Bonney's statement about how he and other officers at the bus stop "work security kind of like TSA" affected the substance of the discussion preceding consent— which, in any event, is only one of several factors courts consider in determining whether consent to search is voluntarily given. *See United States v. Correa*, 641 F.3d 961, 966 (8th Cir. 2011).

      ii.    "Things Left Unsaid"

The second sub-argument Whitfield raises with respect to whether he provided valid consent to search is that Judge Nelson failed "to give adequate weight to the following factors: the fact [that] TFO Bonney did not tell Whitfield he was free to refuse consent, that TFO Bonney [did not provide] Whitfield with his *Miranda* rights, and that TFO Bonney [did not tell Whitfield] that he was free to leave[.]" Filing 60 at 4. Later on in his Statement of Objections, Whitfield claims that Judge Nelson's "consent analysis paid short shrift to the fact that this information was not provided to [him] and that Judge Nelson "gave the withholding of this information legally inadequate weight" under the law. Filing 60 at 5.

The Court disagrees. Judge Nelson explicitly noted in his Findings and Recommendation that "TFO Bonney did not inform Defendant of his right to refuse consent, which does weigh against voluntariness[.]" Filing 56 at 14. However, Judge Nelson also—correctly—acknowledged that this consideration is not dispositive and that under the totality of the circumstances other factors weighed in favor of finding voluntariness. *See* Filing 56 at 14–15. *United States v. Flores*,

474 F.3d 1100, 1105 (8th Cir. 2007) ("The fact that [the defendant] was never informed of his right to withhold consent . . . [is] not determinative of the [consent-to-search] issue."). After weighing each of the factors relevant to this analysis independently and considering them under totality of the circumstances on *de novo* review, the Court agrees with Judge Nelson's conclusion.

In considering the factors relevant to this determination, the Court notes that nothing about Whitfield's age, education, intelligence, or sobriety indicates that his consent was less than freely given. Whitfield would have been 21 years-old at the time this occurred, *see* Filing 51 (Government Exhibit 1 at 1), and there has been no suggestion that he lacked sufficient intelligence to understand the nature of the situation or was intoxicated at the time. *See* Filing 51 (Defense Exhibit 101 at 1) (indicating Whitfield was not under the influence of alcohol). To the contrary, ample evidence was introduced showing that Whitfield has a fair degree of prior "experience with the law"—one of the factors relevant to this Court's determination. *Garcia-Garcia*, 957 F.3d at 896-97. *See e.g.*, Filing 51 (Government Exhibit 15; Government Exhibit 16; Government Exhibit 17). Additionally, nothing about the length of questioning, or the substance of any discussion preceding consent suggests that his consent was less than freely given. *Garcia-Garcia*, 957 F.3d at 896-97.

Whitfield's "contemporaneous reaction to the search was [also] consistent with consent." *Garcia-Garcia*, 957 F.3d at 896-97. The video shows that the green bag was immediately apparent the moment Whitfield opened his luggage. Filing 51 (Government Exhibit 3). Whitfield picked up the green bag on his own volition and with no direction from TFO Bonney. Filing 51 (Government Exhibit 3). TFO Bonney then extended his hand toward Whitfield and the green bag and Whitfield, in turn, extended his own hand toward TFO Bonney and handed the green bag to him without any resistance—either verbal or physical. Filing 51 (Government Exhibit 3). The totality of the

circumstances and balance of other factors relevant to this analysis leave the Court firmly convinced that a reasonable officer in TFO Bonney's circumstance would have understood Whitfield to be consenting to the search of his luggage. *See United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) ("[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether a reasonable officer would believe consent was given") (internal quotation marks omitted).

### iii.   "The Impact of Detention"

The third sub-argument Whitfield raises with respect to whether he provided valid consent to search is that Judge Nelson erroneously concluded Whitfield "was 'not outnumbered by a large law enforcement presence' at the time he provided putative consent to search his suitcase." Filing 60 at 5 (quoting Filing 56 at 13). First, as a factual matter, TFO Bonney and SA Dworek were the only officers initially present at the time Whitfield consented to a search of his suitcase. *See* Filing 51 (Government Exhibit 3; Government Exhibit 4). TFO Jaworski and TFO Peck did not arrive until after Whitfield had already opened his luggage and began handing items to TFO Bonney. *See* Filing 51 (Government Exhibit 4; Government Exhibit 10). The Court agrees with Judge Nelson that this did not constitute "a large law enforcement presence" under the circumstances. *See* Filing 56 at 13. Second, the arguments Whitfield actually makes on this objection are regurgitations of the same arguments he made in contesting the consensual nature of the encounter. The Court has already concluded that Whitfield was not detained at the time he provided consent to search his luggage and, therefore, this argument is unpersuasive.

### iv.   "Denial Followed by Acquiescence is Insufficient"

The fourth and final sub-argument Whitfield raises with respect to whether he provided valid consent is that "acquiescence after express denial could [not] reasonably be interpreted as

consent." Filing 60 at 6. The Court disagrees and, once again, emphasizes that Whitfield himself later admitted on camera that he did in fact consent to the search. *See* Filing 51 (Government Exhibit 3). It stands to reason that if Whitfield believed he was consenting, a reasonable officer in this situation would have thought so too. *Rodriguez*, 834 F.3d at 940. Moreover, and as Judge Nelson correctly observed, although Whitfield initially "declined TFO Bonney's request for consent to search because he was concerned about missing his bus; TFO Bonney thereafter did not imply or force [Whitfield] to consent, and only stated the bus driver was not going to leave [Whitfield]." Filing 56 at 14. Whitfield then took several actions that would have clearly suggested to a reasonable officer that he would consent to such a search under these circumstances, as evidenced by the fact that he shrugged, walked toward the bus's luggage compartment where his luggage was, and ultimately began pulling his suitcase into the backroom where he unzipped it without prompting. *See* Filing 51 (Government Exhibit 3). Accordingly, this argument lacks merit.

v.   Conclusion

Having considered the totality of the circumstances including the nature of the interaction between law enforcement and Whitfield, his personal characteristics and behavior, as well as the environment surrounding Whitfield at the time he gave consent, *Garcia-Garcia*, 957 F.3d at 897, the Court agrees on *de novo* review that Whitfield consented to a search of his red suitcase. For the foregoing reasons, the Court overrules Whitfield's third objection to Judge Nelson's Findings and Recommendation.

4.   *Objection 4: "Limitation"*

Whitfield's fourth objection is captioned, "Limitation." Filing 60 at 7. He objects "to the conclusion that his removal of items from the suitcase did not expressly limit or revoke any putative consent to search the suitcase or the items themselves." Filing 60 at 7. Whitfield instead

25

maintains that his "removal of items from the suitcase was 'conduct . . . clearly inconsistent with the apparent consent to search . . . .'" Filing 60 at 7 (ellipses in original) (citing *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005). Here again, the Court notes that Whitfield's own admission that he did, in fact, consent to TFO Bonney searching his luggage significantly undermines this argument. *See* Filing 51 (Government Exhibit 3).

Nevertheless, the Court will now explain why—irrespective of this significant admission— his "limitation" objection lacks merit. As the Court previously explained, any reasonable officer in TFO Bonney's position would have understood Whitfield to be consenting to a search of his luggage when he began unzipping it on the floor without prompting. *See* Filing 51 (Government Exhibit 1). While Whitfield may have had the ability to limit the scope of this consensual search (prior to the point in time when officers were in possession of facts giving rise to probable cause), the body camera footage does not show him taking any type of actions that would indicate he was either limiting the scope of the search or withdrawing consent. *See United States v. Sanders*, 424 F.3d 768, 774-75 (8th Cir. 2005) (noting that "[c]onduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of the both" and that "when a defendant's actions are ambiguous or equivocal courts refuse to find an effective withdrawal of consent"); *United States v. Beckman*, 786 F.3d 672, 679 (8th Cir. 2015) ("Where a suspect provides general consent to search, only an act clearly inconsistent with the search, an unambiguous statement, or a combination of both will limit the consent" and "[a] subtle indication that a suspect wishes to limit the scope of a search is insufficient to render the search unreasonable"). Because Whitfield did not take any such unambiguous or clear actions demonstrating his desire to withdraw or limit the scope of the consent search, this objection lacks merit and is overruled.

26

    *5.  Objection 5: "The Unlawful Search and Seizure of the Green Bag"*

    Whitfield's fifth objection is captioned, "The Unlawful Search and Seizure of the Green Bag." Filing 60 at 1. He takes issue with Judge Nelson's "characterization that he 'handed' the green bag to TFO Bonney." Filing 60 at 8 (citing Filing 56 at 15). Whitfield insists that rather than "handing" the bag over, TFO Bonney "grabbed" it. *See* Filing 60 at 8. This objection flows from and is related to Whitfield's previous objection that he attempted to limit the scope the consent search. Whitfield argues that "[a]s [he] attempted to limit any consent, TFO Bonney "grabb[ed] the bag from him." Filing 60 at 8 (citing Filing 55 at 106). Thus, in his view, "Bonney effectuated a Fourth Amendment seizure that lacked reasonable suspicion or probable cause" at the time he "grabbed the green bag" and "the subsequent search of [his] backpack was fruit of the poisonous tree." Filing 60 at 8. The Court has already concluded that based upon its review of the body camera footage, Whitfield did not take any unambiguous or clear actions evincing a withdrawal or limitation of the consent search. Thus, Whitfield's attempt to distinguish "grabbing" from "handing" falls flat and this objection is overruled.

    *6.  "The Search-Incident-to-Arrest Theory"*

    Whitfield's sixth objection is captioned, "The-Search-Incident-to-Arrest Theory." Filing 60 at 9. He objects to Judge's Nelson's "conclusion that probable cause existed to arrest him 'at the time TFO Bonney saw the marijuana dispensary bag containing THC products and smelled the odor of marijuana emitting from the green dispensary bag[.]'" Filing 60 at 9 (alteration in original) (quoting Filing 56 at 16). He makes four specific arguments on objection. Filing 60 at 9-13.

    Whitfield first argues that "TFO Bonney's search of the green bag was unconstitutional" because anything that he "saw" or "smelled" were fruits of his "unlawful detention, consentless

search of his suitcase, and/or the seizure of the green bag." Filing 60 at 9. The Court has already analyzed and dispensed with these same arguments. Therefore, this first argument lacks merit.

Whitfield's second argument takes issue with "the suggestion that TFO Bonney *simultaneously* saw the bag and smelled anything emitting from it." Filing 60 at 9 (emphasis in original). Whitfield correctly notes that TFO Bonney testified he smelled marijuana emitting from the dispensary bag "after" he "grabbed it." Filing 60 at 9 (citing Filing 55 at 62). It is worth noting that between the time that TFO Bonney would have seen the green dispensary bag and when he held it, a mere three seconds passed. *See* Filing 51 (Government Exhibit 3). Regardless, the "suggestion" that Whitfield takes issue with was not made in Judge Nelson's Findings and Recommendation. Judge Nelson—correctly—said, "TFO Bonney testified that he could 'smell marijuana emitting' from the green bag." Filing 56 at 4.[14] This recitation is consistent with the evidence and testimony introduced at the hearing. Whitfield's argument on this front does not impact the analysis either.

Whitfield's third and fourth arguments take issue with "the implication that the mere sight of a bag from a Colorado-based store provides the police with probable cause to believe its possessor has marijuana." Filing 60 at 9. In support of this argument, Whitfield points to evidence he introduced at the hearing showing that legal products are also available at this same store. Filing 60 at 10 (citing Filing 51 (Defense Exhibit 105)). Whitfield also points to other exhibits he offered at the hearing indicating that certain THC products are, in his words, "no longer *per se* illegal in Nebraska." Filing 60 at 10 (citing Filing 51 (Defense Exhibit 102; Defense Exhibit 103; Defense

---

[14] Later on in the Findings and Recommendation, Judge Nelson noted that "at the time TFO Bonney saw the marijuana dispensary bag containing THC products and smelled the odor emitting from the green dispensary bag, probable cause existed to arrest Defendant" and that "TFO Bonney testified he smelled the strong odor of marijuana coming from a dispensary bag and saw a THC 'warning' label on the packaging inside[.]" Filing 56 at 16–17. On neither occasion did Judge Nelson make the "suggestion" that Whitfield takes issue with and Whitfield has not cited to any particular portion of the Findings and Recommendation where he claims such "suggestion" was made.

Exhibit 104)); *see also* Filing 55 at 107. Whitfield acknowledges Eighth Circuit precedent holding that law enforcement officers have probable cause to arrest an individual for marijuana possession upon detecting "the odor of marijuana emanating from" that individual. *See* Filing 60 at 10 (citing *United States v. Perdoma*, 621 F.3d 745 (8th Cir. 2010)). Nevertheless, he argues that because Nebraska has now legalized certain THC products, TFO Bonney would have needed "to believe that the items in Whitfield's possession were marijuana" and, "the mere 'smell' of marijuana (and/or a 'THC' label) is insufficient to provide probable cause to arrest." Filing 60 at 10.

The Court is not persuaded. As the Supreme Court has explained, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *D.C. v. Wesby*, 583 U.S. 48, 61 (2018); *see also United States v. Perry*, 908 F.3d 1126, 1129–30 (8th Cir. 2018) (relying on *Wesby* in concluding that a suspect's "possible innocent explanation did not require the officers to disregard other, less innocent possibilities or to ignore other circumstances indicating guilt"). Thus, the officers here were not required to rule out the possibility that the dispensary bag from Colorado contained only legal products before concluding they had probable cause because "officers only need a 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity[.]'" *United States v. Green*, 9 F.4th 682, 690 (8th Cir. 2021) (quoting *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013)).

TFO Bonney was in possession of facts showing a "probability or substantial chance of criminal activity[,]" *Green*, 9 F.4th at 690, particularly given what he learned from Whitfield during their consensual conversation moments earlier. The bus Whitfield was on came through Denver and Whitfield specifically told TFO Bonney that he had a layover in Denver. Filing 55 at 27, 29, 54–55. When TFO Bonney previously asked Whitfield outside the bus stop if he had any marijuana on him, the combination of his words and body language indicated to TFO Bonney that he was

saying, "no, that was back in Denver." Filing 55 at 54; Filing 51 (Government Exhibit 3). TFO Bonney also testified at the suppression hearing that based on his training and experience which included his drug interdiction work, he believed that the green dispensary bag contained "[l]eaf marijuana or raw marijuana products" and when he looked in the bag he believed it to contain "[m]arijuana products." Filing 55 at 138–39. Given the totality of facts that were known to TFO Bonney, he had probable cause to believe that Whitfield was in possession of illegal marijuana products at the time. For this reason, the Defendant's sixth objection is without merit.

7. *Objection 7: "Obstruction"*

Whitfield's seventh and final objection is captioned, "Obstruction." Filing 60 at 11. He takes issue with the Government's argument that "even if the officers [did not] have probable cause to arrest [him] for possession marijuana, he obstructed TFO Jaworski's attempt to search his backpack and therefore could be arrested for violating Neb. Rev. Stat. § 28-906." Filing 60 at 11 (citing Filing 59 at 3-4). While the Government did make this argument in arguing that suppression was improper, Judge Nelson did not rely upon this argument in his Findings and Recommendation. *See generally* Filing 56; Filing 28 at 33–36. Indeed, Whitfield's citation to Filing 59 is to the "Government's Response to Findings and Recommendation" that it submitted over a week after Judge Nelson submitted his Findings and Recommendation, Filing 56. In this subsequent filing, the Government requested that this Court "make an additional legal finding" that Judge Nelson did not make. *See* Filing 59 at 2.

Accordingly, Whitfield's seventh objection does not actually relate to the Findings and Recommendation; it relates to an alternative argument the Government made but was not relied upon by Judge Nelson. Whitfield does not cite a single portion of the Findings and Recommendation that he claims is at issue on this objection. *See* Filing 60 at 11-13. The Court

declines to weigh in on the Government's alternative argument that Judge Nelson's Findings and Recommendation does not rely upon. Thus, this objection relates to a matter that is not properly before the Court. *See* Fed. R. Crim. P.59(b) (noting that "a party may serve and file specific written objections to the proposed findings and recommendations"); Fed R. Crim. P. 59(c) (stating that the "district court must consider de novo any objection to *the magistrate judge's recommendation*) (emphasis added). Whitfield is not entitled to any relief on this objection.

### III.   CONCLUSION

For the foregoing reasons, and upon *de novo* review, The Court agrees with the findings and conclusions reached by Judge Nelson. Whitfield's objections lack merit, and all other issues that have not been raised by Whitfield are waived. *See* Fed. R. Crim. P. 59(b). Accordingly,

IT IS ORDERED:

1. Whitfield's Statement of Objections, Filing 60, is overruled;

2. Judge Nelson's Findings and Recommendation, Filing 56, is adopted in its entirety; and

3. Whitfield's Motion to Suppress, Filing 23, is denied.

Dated this 22nd day of September, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge

31